## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF COLORADO

In re: )

) Case No. 11-34121-MER

ROTH, JOSEPH ANTHONY )

EIN/SSN: xxx-xx-3705 ) Chapter 7

)

Debtor(s) )

_____ )

TASHEENA POLANCO, )

)

Plaintiff, )

)

v. )

) Adv. Proc. No. 12-1010-MER

JOSEPH ANTHONY ROTH, )

)

Defendant. )

)

FILED
U.S. BANKRUPTCY COURT
DISTRICT OF COLORADO
2012 SEP 10 PM 3:43
BRADFORD L. BOLTON
CLERK

---

### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Tasheena Polanco ("Plaintiff" or "Polanco"), by and through her attorneys, the Traylor Law Group, LLC, and pursuant to FED. R. BANKR. P. 7056 and L. R. BANKR. P 7056-1(b), hereby submits this Response to Defendant's Motion for Summary Judgment ("Motion"), and in support thereof states the following:

#### INTRODUCTION

Defendant Joseph Roth ("Defendant" or "Roth") is seeking summary judgment on Ms. Polanco's claim under 11 U.S.C. § 523(a)(6) based on the premise that he had no intent to injure Ms. Polanco. He also makes an irrelevant attempt to discredit the extent of her injuries, while conspicuously failing to deny that the injuries occurred. However, as discussed below, Mr. Roth's position is incredible and unsupported by *objective, undisputed facts*.

1

To support his Motion, Mr. Roth presents a single, self-serving affidavit and relies on a completely erroneous legal argument that a sexual harassment claim cannot be the basis for nondischargeability under § 523(a)(6). Ms. Polanco, on the other hand, can identify significant evidence of her injuries and of Mr. Roth's intent to inflict those injuries. These are issues of material fact that—when taken in the light most favorable to Ms. Polanco—preclude the entry of summary judgment in this matter. Accordingly, Ms. Polanco respectfully requests that this Court deny Mr. Roth's Motion.

### RESPONSES TO FACTS ASSERTED BY DEFENDANT

1.      Ms. Polanco admits that her Complaint Objecting to Dischargeability of Indebtedness Pursuant to U.S.C. § 523 ("Adversary Complaint") lists several allegations regarding Mr. Roth's conduct toward her. Ms. Polanco also admits that Mr. Roth submitted an affidavit with his Motion addressing the allegations in the Adversary Complaint.

2.      Ms. Polanco admits that the Adversary Complaint generally alleges that Mr. Roth caused harm and injuries to Ms. Polanco.

3.      Ms. Polanco admits that she submitted the language quoted in Paragraph 3 of the Motion in her Responses to Defendant's First Set of Interrogatories.

4.      Ms. Polanco denies that she has not seen any "counselors" for her emotional distress. Ms. Polanco has visited with a counselor, Cathy Barton, on several occasions to discuss the emotional damages caused by Mr. Roth. (Polanco Aff. ¶ 28.) Ms. Barton was identified by Ms. Polanco in her Initial Disclosures. (Ex. 1.) Ms. Polanco did not discuss her interactions with Ms. Barton in any of her responses to Defendant's First Set of Interrogatories because that information was not responsive to any of Mr. Roth's Requests. (Ex. 2.) Ms. Polanco admits that she has not been prescribed any medication for her injuries.

6.[1]      Ms. Polanco denies that Mr. Roth's conduct was not intended to cause injuries to Ms. Polanco. (Polanco Aff. ¶4.)

7.      Ms. Polanco admits that she had not met Mr. Roth prior to seeking employment at Roth Automotive.

8.      Ms. Polanco denies that Mr. Roth did not dislike or have any animus toward Ms. Polanco during her employment. (Polanco Aff. ¶ 4-5.)

9.      Ms. Polanco denies that Mr. Roth did not intend to injure Ms. Polanco or believe that his conduct was substantially certain to cause injuries to her. (Polanco Aff. ¶ 4.)

## FACTS OMITTED BY DEFENDANT

10.      Ms. Polanco was hired by Mr. Roth on May 12, 2009 to work at Roth Automotive. (Polanco Aff. ¶ 6.)

11.      Prior to Ms. Polanco's employment at Roth Automotive, Mr. Roth was introduced to Ms. Polanco through Ms. Polanco's mother. (Roth Depo. 14:22-23, September 8, 2011.)

12.      On Ms. Polanco's first day of work, Mr. Roth asked her if she had a boyfriend. (Polanco Aff. ¶ 7; Roth Dep. 66:22-67:1.)

13.      During Ms. Polanco's employment, Mr. Roth frequently made comments about her breasts. (Polanco Aff. ¶ 8.) In fact, even before Ms. Polanco was hired, Mr. Roth told her that he "liked her boobs." (Roth Dep. 69:10-18.)

14.      On another occasion, while Ms. Polanco was leaning across a desk to clean it, Mr. Roth remarked, "Look what's on the desk." (Polanco Aff. ¶ 9.)

---

[1] The list of facts in Defendant's Motion does not include a Paragraph No. 5. Accordingly, Plaintiff has numbered the paragraphs in this section in order to correspond with the paragraph numbers in Defendant's Motion.

15.    When a former employee of Roth Automotive, Larry Streeter, was in the shop, Mr. Roth told Mr. Streeter, "Your replacement has boobs." (Roth Dep. 71:2-9; Polanco Aff. ¶ 10.)

16.    During her employment, as Plaintiff was cleaning a glass window, Mr. Roth approached the other side of the glass and licked the glass across from Ms. Polanco's breasts. (Polanco Aff. ¶ 11.)

17.    On another occasion, as Ms. Polanco was cleaning a vehicle, Mr. Roth came over and stated, "I just came by because I heard you were showing some major thong-age." (Roth Dep. 72:13-16.)

18.    Mr. Roth regularly described his own sexual conduct to Ms. Polanco, including visiting strip clubs, paying women for sex, having sex at the auto shop, and trading car repair services for sexual favors. (Roth Dep. 78:14-16, 86:8-21, 90:9-91:5.)

19.    Mr. Roth described one particular occasion in which he and two other employees of Roth Automotive paid a woman to perform sexual acts, including oral sex, on each of them. (Roth Dep. 90:9-91:5; Polanco Aff. ¶ 13.)

20.    Mr. Roth told Ms. Polanco that he had been to "whore houses" and that he knew of a place where he could have sex with "new, hot Hispanic girls" for forty dollars. (Roth Dep. 74:13-21; Polanco Aff. ¶ 14.)

21.    Ms. Polanco is Hispanic, and Mr. Roth was aware of Ms. Polanco's ethnicity when he made this comment. (Roth Dep. 74:22-23; Polanco Aff. ¶ 14.)

22.    On one occasion, Mr. Roth showed Ms. Polanco a condom and told her he was going to a strip club after work. (Polanco Aff. ¶ 15.)

23.     Mr. Roth showed Ms. Polanco a sexually explicit photograph that was found in one of the vehicles, and then displayed the photograph in the shop. (Roth Dep. 63:20-64:3; Polanco Aff. ¶ 16.)

24.     One day, Ms. Polanco stated that she was going to the restroom. In response, Mr. Roth cupped his hands and asked her, "Can I help?" (Polanco Aff. ¶ 17.)

25.     Mr. Roth made unwelcome and inappropriate sexual contact with Ms. Polanco multiple times. (Polanco Aff. ¶ 18-20.)

26.     In one instance, while giving Ms. Polanco a high five, Mr. Roth touched Ms. Polanco's breast with his elbow, and then stated, "Ooh, let's try that one more time." (Roth Dep. 83:7-84:2; Polanco Aff. ¶ 19.)

27.     While Ms. Polanco and Mr. Roth were using the computer, Mr. Roth reached between Ms. Polanco's legs to throw away a piece of trash. As he pulled his hand back, he intentionally brushed his hand against her crotch, then smelled his hand and stated, "Thanks." (Polanco Aff. ¶ 20; Roth Dep. 84:3-9.)

28.     Mr. Roth asked Ms. Polanco several times during her employment to give him a massage, and each time, Ms. Polanco declined his request. (Roth Dep. 56:18-20; 65:24-66:8; Polanco Aff. ¶ 21.)

29.     Mr. Roth's first request for a massage occurred on Ms. Polanco's first day of work. (Roth Dep. 65:24-66:2; Polanco Aff. ¶ 21.)

30.     Mr. Roth even called Ms. Polanco at home to ask her to give him massages. (Roth Dep. 65:24-66:2; Polanco Aff. ¶ 21.)

31.     On June 6, 2008, Mr. Roth again asked Ms. Polanco to give him a massage, and Ms. Polanco refused to do so. (Polanco Aff. ¶ 22.)

32.     Two days later, on June 8, 2009, Ms. Polanco was terminated. (Roth Dep. 96:21-23.)

33.     On September 8, 2011, the undersigned counsel took Mr. Roth's deposition, pursuant to Ms. Polanco's state court civil action in Adams County District Court ("the State Court Action"). (Roth Dep. 1)

34.     During Mr. Roth's deposition, he admitted to believing that women who dress provocatively deserve to be raped. (Roth Dep. 77:10-78:6.)

35.     Mr. Roth also claimed during his deposition that he believed Ms. Polanco dressed too provocatively. (Roth Dep. 20:24-21:1.)

36.     Ms. Polanco has been raped on two occasions. (Polanco Aff. ¶ 24.)

37.     After being informed that Ms. Polanco has been raped twice, Mr. Roth stated, "[I]t's her own fault." (Roth Dep. 94:7-8.)

38.     Mr. Roth's conduct caused severe emotional and mental injuries to Ms. Polanco. (Polanco Aff. ¶ 25-28.)

39.     Ms. Polanco has developed severe anxiety as a result of Mr. Roth's actions, and she has experienced fear, anxiousness, sadness, and hurt since her termination. (Polanco Aff. ¶ 25.)

40.     She has also developed a fear of persons of authority, in particular unfamiliar males. (Polanco Aff. ¶ 26.)

41.     Because Ms. Polanco has not been employed since her termination from Roth Automotive, she has been unable to seek medical attention for her injuries. (Polanco Aff. ¶ 27.)

42.     Instead, in order to cope with her emotional distress, Ms. Polanco began seeing a counselor, Cathy Barton, through a free program at her church. She visited Ms. Barton several times during 2010 and 2011. (Polanco Aff. ¶ 28.)

## ARGUMENT

### I.     *Standard of Review*

Ms. Polanco agrees with the standard of review for summary judgment recited in Defendant's Motion.

### II.     *11 U.S.C. § 523(a)(6) Claim*

The Bankruptcy Code exempts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). This statute only applies to "acts done with the actual intent to cause injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Thus, the plaintiff must show "that the actor intended the consequences of the act, not simply the act itself." *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) (quoting *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. B.A.P. 1999)) (internal quotation marks omitted). This provision "may apply to a broad range of [tortious] conduct causing harm to people or property." *Musich v. Graham (In re Graham)*, 455 B.R. 227 (Bankr. D. Colo. 2011) (internal quotation marks omitted).

### A.     *Burden of Proof and Elements.*

In order to establish a claim for nondischargeability under § 523(a)(6), the plaintiff must prove that the injury was both: (i) willful; and (ii) malicious. *Moore*, 357 F.3d at 1129; *see also McCain Foods USA, Inc. v. Shore (In re Shore)*, 317 B.R. 536, 542 (10th Cir. B.A.P. 2004). The

plaintiff has the burden of establishing these elements by a preponderance of the evidence. *Shore*, 317 B.R. at 542.

       B.     *Mr. Roth willfully caused Ms. Polanco's injuries.*

Under § 523(a)(6), an injury is willful if the actor either intended to cause injury or knew that his conduct that was substantially certain to result in injury. *Moore*, 357 F.3d at 1129.

Defendant's Motion argues that Ms. Polanco's injuries could not have been willful because "sexual harassment is not an intentional tort sufficient to operate as a basis for nondischargeability under § 523(a)(6)." (Def.'s Mot. Summ. J. 6.) To support this proposition, Mr. Roth relies solely on the decision in *Sanger v. Busch*, 311 B.R. 657 (Bankr. N.D. N.Y. 2004). However, notwithstanding the limited persuasive value of a single case from another circuit, that decision was a questionable application of the § 523(a)(6) standards set forth in *Geiger. See* Andy Gaunce, *Rethinking In re Busch: Bankruptcy Discharge of Sexual Harassment Judgments Under Section 523(a)(6)*, 56 S.C. L. REV. 645 (2005). Nonetheless, there have been numerous other cases in which courts held that claims for injuries resulting from sexual harassment were nondischargeable under § 523(a)(6).

For example, in *McDonough v. Smith (In re Smith)*, 270 B.R. 544 (Bankr. D. Mass. 2001), the debtor and the plaintiff had been involved in a consensual relationship. *Smith*, 270 B.R. at 546. After the relationship ended, the debtor began revoking the plaintiff's employment privileges and threatening her job security and future in the automotive industry. *Id.* The plaintiff secured a judgment against the debtor and the company for sexual harassment. *Id.* at 547. The bankruptcy court then held that the debt was nondischargeable under § 523(a)(6). *Id.* at 550.

In *Basile v. Spagnola (In re Spagnola)*, 473 B.R. 518 (Bankr. S.D. N.Y. 2012), the plaintiff obtained a judgment against the debtor in the Southern District of New York for

"creat[ing] a hostile work environment during Plaintiff's employment." *Spagnola*, 473 B.R. at 520. The bankruptcy court held that the judgment was nondischargeable. *Id.* at 525. In doing so, the court disagreed with the analysis in *Busch*, holding that "exposure to unwelcome sexual conduct, like an advancing of one's prurient interests to the point of harassment, is the injury that a sexual harassment victim suffers and that a judgment finding an individual intentionally caused that injury is enough to meet the prong of willfulness under § 523(a)(6)." *Id.* at 523. The court also noted that "many bankruptcy courts … have found that sexual harassment discrimination is inherently an intentional tort and allowed it to be excepted from discharge as a willful and malicious injury." *Id.* at 524. Clearly sexual harassment can be the basis for a nondischargeable debt pursuant to § 523(a)(6), and therefore, Mr. Roth cannot attempt to avoid liability by characterizing it as such.

Mr. Roth claims that he had no intent to cause Ms. Polanco's injuries. However, he provides no evidence to support this contention other than an entirely self-serving affidavit. Indeed, there is significant evidence that could support a finding that Ms. Polanco's injuries were willfully inflicted by Mr. Roth.

As cited above, Mr. Roth subjected Ms. Polanco to egregious sexual harassment nearly every day at work. He made constant lewd remarks about visiting strip clubs, hiring prostitutes, and trading car repair services for sexual favors. He frequently commented about Ms. Polanco's breasts—both directly to her and to others—and even licked a glass window only inches away from her breasts. Moreover, Mr. Roth actually *physically touched* Ms. Polanco in a sexual manner on two occasions, including touching her breast and her crotch. Ms. Polanco has asserted a claim for battery against Mr. Roth based on these incidents of unwelcome physical contact. Mr. Roth also repeatedly requested massages from Ms. Polanco, and those requests continued outside

the workplace. Eventually, Mr. Roth terminated Ms. Polanco after she refused his final request for a massage.

In addition to subjecting Ms. Polanco to constant deplorable conduct during her employment, Mr. Roth's statements during his deposition also suggest that his actions were intended to cause injury to Ms. Polanco. For example, Mr. Roth said that he does not "respect" Ms. Polanco. (Roth Dep. 93:6-7.) Mr. Roth also stated that Ms. Polanco "[s]howing her body like she was" prompted him to tell her about paying for sex and visiting "whorehouses," and that Ms. Polanco "invited [his behavior] because of the way she dressed." (Roth Dep. 76:10-12, 92:20-23.)

Mr. Roth also made deeply disturbing comments regarding women and rape. First, Mr. Roth explained that women who dress provocatively "invite" rape, and that a rape "[c]ould be" the woman's fault because of the way she dressed. (Roth Dep. 77:10-19.) After being informed that Ms. Polanco had been raped twice, Mr. Roth stated, *"If she's been raped and she doesn't fix her clothing, it's her own fault."* (Roth Dep. 94:7-8.) Certainly an individual advocating rape *intends* to cause significant physical and emotional harm, or at least knows full well that it is going to occur.

Based upon the foregoing, there is sufficient evidence to support a finding that Mr. Roth's actions were intended to cause injury to Ms. Polanco and were substantially certain to do so. Mr. Roth's comments during his deposition suggest that he had intense animus toward Ms. Polanco, and his actions during her employment demonstrate that he wanted to cause her harm. Therefore, there is a genuine issue of material fact regarding whether Ms. Polanco's injuries were "willful" within the definition of § 523(a)(6).

      C.     *Mr. Roth maliciously caused Ms. Polanco's injuries.*

10

Under § 523(a)(6), an injury is "malicious" if it was inflicted "without just cause or excuse," *Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 880 (Bankr. D. Colo. 2004); *see also Graham*, 455 B.R. at 233. Sexual harassment is malicious as a matter of law. *Spagnola*, 473 B.R. at 524. Certainly Mr. Roth can identify no "just cause or excuse" for his egregious behavior. In fact, his Motion makes no attempt to do so. Therefore, this element of Ms. Polanco's claim is undisputed.

> D.    *Ms. Polanco suffered significant emotional injuries as a result of Mr. Roth's conduct.*

Mr. Roth does not directly deny that Ms. Polanco sustained injuries as a result of his conduct. Rather, his Motion attempts to discredit the severity of Ms. Polanco's emotional injuries by noting that "Ms. Polanco has not seen any medical providers." (Def.'s Mot. Summ. J. 2.) He also states that Ms. Polanco only identifies her injuries generally in the Adversary Complaint. (Def.'s Mot. Summ. J. 1.) This is not the relevant standard. The only issue for this Court is whether Mr. Roth willfully and maliciously caused Ms. Polanco's injuries, not the extent or amount of those injuries. Nonetheless, Mr. Roth makes no attempt to deny that the injuries occurred, nor has he attempted to dismiss her claim based on the sufficiency of the pleadings.

As discussed above, Ms. Polanco suffered from severe emotional distress and mental anguish as a result of Mr. Roth's conduct. Mr. Roth has offered no evidence to the contrary. Therefore, this element of her claim is not at issue.

## CONCLUSION

Based upon the foregoing, Plaintiff has submitted sufficient evidence to create a triable issue of fact on each of the elements of her claim. Therefore, summary judgment is not appropriate in this matter, and Defendant's Motion should be denied.

DATED this 10th day of September, 2012.

11

Respectfully submitted,

**TRAYLOR LAW GROUP, LLC**

Whitney C. Traylor
Craig T. Truitt
1721 High Street
Denver, CO 80218
Phone: (303) 321-1862
Facsimile: (303) 837-1214

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was served on this 10th day of September, 2012, via United States Mail addressed to the following:

Robert C. Wolf, Esq.
P.O. Box 1875
Arvada, CO 80001

Manuel J. Solano, Esq.
12000 N. Washington St., Ste. 3101
Thornton, CO 80241

Craig T. Truitt

1    DISTRICT COURT, ADAMS COUNTY, COLORADO

2    Case No. 2010CV832, Division C

3    ———————————————————————————————

     DEPOSITION OF:  JOE ROTH - September 8, 2011

4    ———————————————————————————————

5    TASHEENA POLANCO,

6    Plaintiff,

7    v.

8    JOE ROTH, an individual; ROTH'S AUTO, a Colorado
     company,

9

     Defendants.

10    ———————————————————————————————

11

12          PURSUANT TO NOTICE, the deposition of
     JOE ROTH was taken on behalf of the Plaintiff at 1721
13    High Street, Denver, Colorado 80218, on September 8,
     2011, at 8:55 a.m., before Ashley Mahe, Notary Public
14    within Colorado.

15

16

17

18

19

20

21

22

23

24

25

JOE ROTH

14

```
 1          A.    I would say -- I don't know.  Five, ten
 2    times.
 3          Q.    When was the last conversation you had
 4    with him about this lawsuit?
 5          A.    When we went to court and the judge told
 6    me that I should get representation.
 7          Q.    And what was the substance of your
 8    conversations with Mr. Sabas regarding this lawsuit?
 9          A.    Well, because we don't think -- we think
10    that Tasheena is being -- creating things that
11    happened.
12          Q.    So you're aware of the allegations that
13    she's making against you?
14          A.    Yes.
15          Q.    And you're denying those?
16          A.    Yes.
17          Q.    And you believe that she is making those
18    up?
19          A.    Yes.
20          Q.    Why do you believe that?
21          A.    Because when I hired her, she told me
22    that she would do anything to get a job and so -- I
23    knew her through her mother, and her mother used to
24    come to the shop as a customer of mine.  And so I
25    didn't have an employee, I had this guy by the -- oh,
```

JOE ROTH

```
 1    customers?

 2            A.    Yes.

 3            Q.    And you had zero customer complaints?

 4            A.    Well, I don't see those.  Chris at U-Haul

 5    does.  There is like a thing when you rent out a

 6    U-Haul, you can call the 1-800 number.  So I wouldn't

 7    know that.  That's how he grades certain things, and

 8    she didn't last long enough.  She was only there,

 9    like, four weeks.

10            Q.    Okay.  You're not aware of any customer

11    complaints made against Ms. Polanco?

12            A.    Right.

13            Q.    And no customer complaints were made to

14    you or to Roth U-Haul about Ms. Polanco?

15            A.    Right.  Yes.

16            Q.    Doug Donner, you said you had

17    conversations with him about this lawsuit?

18            A.    Yeah.

19            Q.    When did you have conversations with

20    Mr. Donner about the lawsuit?

21            A.    Probably about a year ago.

22            Q.    And what was the nature of that

23    conversation?

24            A.    I just said that I can't believe that

25    Tasheena is taking me to court, because the way that
```

JOE ROTH

1    she would dress showing, you know, herself, and he

2    made com- -- he was one of them that made a comment

3    that he can't believe that somebody would come to work

4    and set her boobs up on the desk.

5         Q.   What did you say when he made that

6    comment?

7         A.   Well, they're like subcontractors.  I

8    really can't tell them -- you know, like if she didn't

9    want to come to work that day, she has to call me, and

10   I have to come in because I can't really tell them

11   when to work and when not to work.  I tell them, I

12   wish you would come from 8:30 to 9:00.  That's what

13   our agreement was.

14        Q.   Sir, you just said that Mr. Donner said

15   that he couldn't believe that Ms. Polanco came to work

16   and put her boobs on the desk?

17        A.   Right.

18        Q.   And I asked you --

19        A.   It looked like that.

20        Q.   -- what was your response to that

21   comment?

22        A.   I said, I can't believe she does that

23   either.

24        Q.   Did you ever ask her to dress more

25   appropriately?

JOE ROTH

1    job, come in and try it.

2         Q.    And what was the actual job?

3         A.    Renting U-Hauls.

4         Q.    Is there a job title?

5         A.    No.

6         Q.    And was it your idea to have her work

7    three days a week?

8         A.    Yes.  That's all I could afford.

9         Q.    And what was the arrangement in terms of

10   how much you would pay her?

11        A.    I think it was $200 Friday, Saturday, and

12   Monday.

13        Q.    Okay.  And when did she start?

14        A.    Around that date right there where her

15   tests were.

16        Q.    Do you remember how soon after you had

17   the conversation about hiring her that she started?

18        A.    Well, before she was hired, she told me

19   she was a massage therapist, and I told her, Well, you

20   could give me a massage, and so I called her and she

21   -- you know, I don't know if she was busy or in

22   between -- because she was on probation for something

23   that she had done, and so she was actually -- when she

24   was on the computer, she was talking to, like, a

25   probation officer saying how wonderful the job was and

JOE ROTH

1    and we set the picture over there, and she went out in

2    the workplace and looked at the picture and liked at

3    it.  And she even took a picture of it with her cell

4    phone.

5           Q.    And she told you she liked it?

6           A.    Uh-huh.

7           Q.    And so what was the conversation about

8    that?

9           A.    What the naked lady looked like.

10          Q.    Are you asking me, or is that your

11    answer?

12          A.    No, that's what the answer was.  We were

13    talking about what she looked liked.

14          Q.    Okay.  And what was said?

15          A.    Well, Look at this naked lady, and she

16    came out in the garage and looked at it.

17          Q.    So you asked her to go look at the

18    picture?

19          A.    She came out and looked at it on her own.

20          Q.    You said, Look at the naked lady; is that

21    correct?

22          A.    No.  We said there was a picture in

23    there.  She came out and looked at it on her own.

24          Q.    So you told her there was a picture of a

25    naked lady in the U-Haul?

JOE ROTH

1        A.    She knew it was there.

2        Q.    Did you tell her it was there?

3        A.    She knew it was there.

4        Q.    Sir, your testimony was that somebody

5    said, Look at the naked lady.  Look at the naked

6    picture; is that correct?

7        A.    Yeah.

8        Q.    Who said that?

9        A.    Alex.

10       Q.    Okay.  So Alex said the condom and Alex

11   also said, Look at the naked picture?

12       A.    Yes.

13       Q.    Now, what was your response when he said

14   that?

15       A.    She looked at it and laughed about it,

16   talked about it.  We probably shouldn't have done

17   that.

18       Q.    Okay.  I asked you what your response

19   was.

20       A.    I looked at it with them.

21       Q.    Okay.  And what was your response?

22       A.    I looked at the naked lady and said she

23   was pretty.

24       Q.    So you looked at the naked picture and

25   said, She's pretty?

1          A.    Uh-huh.

2          Q.    Anything else?

3          A.    No.

4          Q.    So what do you think you shouldn't have

5     said about that?

6          A.    Probably shouldn't have had it in the

7     workplace either.

8          Q.    And you have the ability to terminate all

9     of the employees there; is that correct?

10         A.    Yeah.

11         Q.    Okay.  What other statements that you can

12    remember that you feel were sexual innuendos or sexual

13    in nature other than the conversation about the

14    condom, the conversation about the naked picture, and

15    the conversation about Ms. Polanco's dress?

16         A.    That's all I remember.

17         Q.    Okay.  So Ms. Polanco was hired on

18    May 11, 2009; is that correct?

19         A.    Around there.

20         Q.    Okay.  And she was scheduled to start --

21         A.    She took the test on May 29, wasn't it?

22    The course started May 29.  I can't remember.  It's

23    been two years ago.

24         Q.    Okay.  So the day she was scheduled to

25    start, you called her at her home and asked her for a

JOE ROTH

66

```
 1    massage; is that correct?

 2           A.    Uh-huh.

 3           Q.    And what was her response?

 4           A.    That she would give me one.

 5           Q.    Okay.  And did she ever give you one?

 6           A.    No.

 7           Q.    How many times did you ask for a massage?

 8           A.    Two or three.

 9           Q.    Why did you ask her for a massage?

10           A.    Because I get massages.  I got one from

11    her mom.

12           Q.    How often do you get massages?

13           A.    Once a month.

14           Q.    From whom?

15           A.    Her name is Kathleen something.

16           Q.    Okay.  Do you have her phone number?

17           A.    Yeah.

18           Q.    And do you go to her -- where do you get

19    the massage?

20           A.    It's called the Garland Center.  It's

21    called Elegant Ink.

22           Q.    Did you ask Ms. Polanco on her first day

23    of work if she had a boyfriend?

24           A.    I can't remember.

25           Q.    Is it possible that you asked her that?
```

JOE ROTH

```
 1          A.   Yes.
 2          Q.   Okay.  Did you ask her if she liked to
 3   party?
 4          A.   Yes.
 5          Q.   Okay.  What did you mean by "party"?
 6          A.   I'd go across the street and have a beer.
 7          Q.   Did you ask her if she wanted a beer on
 8   the first day of work?
 9          A.   No.
10          Q.   Did you ever ask her if she ever wanted
11   to have a beer?
12          A.   Yeah.
13          Q.   How many times?
14          A.   I would say three, four.
15          Q.   Did you ever ask her if she wanted a line
16   of coke?
17          A.   No.
18          Q.   Do you use cocaine?
19          A.   No.
20          Q.   Have you ever used cocaine?
21          A.   No.
22          Q.   Did you tell the CCRD that you asked her
23   if she wanted a beer and a line of coke?
24          A.   No.
25          Q.   So the investigator for the CCRD -- and
```

JOE ROTH

 1    based on conversations with you and Alex that wrote

 2    you offered her or admitted to offering her a line of

 3    coke, was inaccurate?

 4            A.    Yes.

 5            Q.    Did you tell Ms. Polanco you liked her

 6    boobs?

 7            A.    Yes.

 8            Q.    How many times?

 9            A.    Three.

10            Q.    Okay.  And do you remember the first time

11    you told her that you liked her boobs?

12            A.    When she was sitting in her mom's car

13    before she started working.

14            Q.    And what did you say specifically?

15            A.    Well, she had a very, very low-cut shirt

16    on and you could see her breasts.

17            Q.    And what did you say specifically?

18            A.    Wow, those are nice breasts.

19            Q.    And what did she say?

20            A.    Thank you.

21            Q.    And what was the second time you said it?

22            A.    When she was sitting them on the counter

23    at the -- in front of the computer.

24            Q.    Okay.  And what did you say?

25            A.    I said you should not be sitting your

JOE ROTH

71

| | | |
|---|---|---|
| 1 | Q. | When was the second time? |
| 2 | A. | When Larry came up, and I told Larry that |

3    his replacement had breasts.

| 4 | Q. | Well, that's not saying that you -- |
| 5 | A. | I know, but I said those were nice boobs, |

6    I commented.

| 7 | Q. | So you said, Your replacement has boobs, |

8    they're nice boobs?

| 9 | A. | Uh-huh. |
| 10 | Q. | And she heard that? |
| 11 | A. | Yeah. |
| 12 | Q. | Do you believe that is appropriate |

13    conversation for the workplace?

| 14 | A. | No. |
| 15 | Q. | Do you believe that that is sexual |

16    harassment?

| 17 | A. | No. |
| 18 | Q. | What is your understanding as to what |

19    sexual harassment is?

| 20 | A. | I don't know. |
| 21 | Q. | You have no idea of what sexual |

22    harassment is?

| 23 | A. | No. |
| 24 | Q. | Okay.  Are you aware that you are -- |

25    there are laws in place to protect employees from

JOE ROTH

```
 1    sexual harassment?

 2         A.    No.

 3         Q.    So you don't know any law relating to

 4    sexual harassment?

 5         A.    No.

 6         Q.    At one point Ms. Polanco was leaning over

 7    the desk to clean it, and her breasts were on the

 8    desk, did you tell somebody to look at what's on the

 9    desk?

10         A.    No.

11         Q.    You never said that?

12         A.    No.

13         Q.    At one point when she was cleaning one of

14    the vehicles, did you say, I just came by because I

15    heard you were showing some major thongage?

16         A.    Yes.

17         Q.    And what did you mean by that?

18         A.    Because she was bending over cleaning in

19    a motor home and her pants were showing that and she

20    laughed and chuckled.

21         Q.    Okay.  And so do you believe that is

22    appropriate conversation for the workplace?

23         A.    My question to you is, do you think that

24    is appropriate that she should be dressed like that?

25    I don't think either is appropriate, her dress like
```

JOE ROTH

74

```
 1    somebody putting their breasts on the windows while

 2    they're cleaning it?  Do you see where it's back and

 3    forth?

 4            Q.   So at one point Ms. Polanco asked to go

 5    to the restroom.  Did you cup your hands and ask, Can

 6    I help?

 7            A.   No.

 8            Q.   You never asked --

 9            A.   No.

10            Q.   -- Can I help when she was going to the

11    restroom?

12            A.   (Deponent shook head side to side.)

13            Q.   Did you tell Ms. Polanco that you had

14    been to whorehouses?

15            A.   Yes.

16            Q.   Did you tell her that you had paid for

17    sex?

18            A.   Yes.

19            Q.   And did you tell here that you had paid

20    for sex with Hispanic women?

21            A.   Yes.

22            Q.   And she is Hispanic; is that correct?

23            A.   Yeah.  She don't look Hispanic, but yes.

24            Q.   Did you -- were you implying that you

25    wanted to pay her for sex?
```

JOE ROTH

1    A.    It was just conversation.  She asked us

2    questions.  We asked her questions.

3        Q.    Okay.  What did she ask you --

4        A.    Or we talked about it.  She asked me if I

5    used to -- what I did for fun.  I told her I go over

6    to the bar.  I have a couple beers.  I go home.  I go

7    visit my daughter.  Just stuff like that.  It's just

8    conversation probably at the workplace that we

9    shouldn't have been having.

10       Q.    So what did she ask you that prompted you

11   to say that you pay for sex and you visit whorehouses?

12       A.    Showing her body like she was.

13       Q.    Did she say anything?

14       A.    I can't remember.

15       Q.    So the way she dressed --

16       A.    Uh-huh.

17       Q.    -- caused you to have conversations with

18   her about whorehouses --

19       A.    Yes.

20       Q.    -- and paying for sex?

21       A.    Yes.

22       Q.    So is it your testimony that she invited

23   this conversation because of the way she dressed?

24       A.    Yes.

25       Q.    And how do you reach that conclusion?

JOE ROTH

77

1          A.    I think when a person walks out the door

2     of their house, they know what they're going to be

3     after, whether they dress inappropriately or not

4     appropriately.  So she used to dress like that to

5     flaunt her breasts.  She would wear the low-cut

6     things, wear a thong, and so she dressed like that and

7     she knew all of that was showing.

8          Q.    So your testimony is that she invited it?

9          A.    Yes.

10          Q.    Do you believe if a woman is raped and

11     she's -- because of the way she's dressed or

12     provocatively acting, that she may have invited that

13     type of attention?

14          A.    Depending on her dress.

15          Q.    So a woman who is raped would invite that

16     rape based on her dress?

17          A.    Yep.

18          Q.    So it's the woman's fault?

19          A.    Could be.

20          Q.    What is an example of a woman being raped

21     being her fault?

22          A.    Well, if she is wearing a, like, say, a

23     bikini top and a bikini and she is running around,

24     there is perverts out there and stuff like that and

25     people might want to rape her.

JOE ROTH

1          Q.    And that would be her fault?

2          A.    She should dress more appropriately,

3   yeah.

4          Q.    So your answers is yes, that would be her

5   fault?

6          A.    Yeah.

7          Q.    So is it Ms. Polanco's fault that the

8   comments you made were made?

9          A.    Yeah.

10         Q.    Did you show her a condom and tell her

11  you were going to a strip club after work?

12         A.    We already talked about that.  It was

13  Alex.

14         Q.    Did you tell her that you were going to a

15  strip club after work?

16         A.    Yes, but I didn't go.

17         Q.    So is it your testimony since your

18  contention is that she invited this kind of

19  conversation, then do you believe it was appropriate

20  because of how she was dressed so this was appropriate

21  conversation in the workplace?

22         A.    Her whole thing, she shouldn't have even

23  been hired.

24         Q.    Who hired her?

25         A.    I did.

1          A.    I worked at a liquor store when I was 21.

2          Q.    Why did you tell her that?

3          A.    Just conversation that we used to have.

4          Q.    And this conversation was appropriate

5    because of the way she dressed?

6          A.    Yes.

7          Q.    While giving Ms. Polanco a high five, did

8    you bump her breast with your elbow and state, Oh,

9    let's try that again?

10         A.    If I did, it was on accident.

11         Q.    Did you say, Oh, let's try that again?

12         A.    No.

13         Q.    Did you touch her breast with your elbow?

14         A.    If I did, it was on accident.

15         Q.    My question was, did you touch her breast

16   with your elbow?

17         A.    I don't remember.

18         Q.    Did you tell the CCRD that you touched

19   her breast with your elbow?

20         A.    No.

21         Q.    Okay.  We're going to go through it, but

22   your statement was that you could have touched her

23   breast, but if so, it was probably accidental.  Do you

24   believe that was your testimony?

25         A.    Yeah.

JOE ROTH

84

```
1          Q.    Is that your testimony today?

2          A.    Yes.

3          Q.    Okay.  Was there ever an opportunity that

4     you and Ms. Polanco sat at the computer working on

5     something together?

6          A.    Yeah.

7          Q.    Okay.  And did you reach between her legs

8     to throw away some trash?

9          A.    Yes.

10         Q.    Okay.  And did you brush your hand across

11    her crotch?

12         A.    No.

13         Q.    And then did you smell your hand and

14    state, Thank you?

15         A.    No.

16         Q.    So when she's saying that, that's a lie?

17         A.    Yes.

18         Q.    Do you have any reason to believe why she

19    would lie?

20         A.    Yeah, because she's making half of this

21    stuff up.  It's her saying this, we're saying that, or

22    I'm saying this.  It's back and forth.

23         Q.    Okay.  So you're admitting to saying some

24    of these things?

25         A.    Not that.
```

JOE ROTH

86

1        Q.   Why would you tell him that he needs to

2  keep his mouth shut when you've made some of the very

3  same comments?

4        A.   I should have kept my mouth shut, too.

5        Q.   So you're admitting that you have engaged

6  in wrongdoing?

7        A.   Yeah.

8        Q.   Did you tell Ms. Polanco that while Larry

9  was working for you, that a woman came into the shop,

10  removed her shirt, and allowed you, Larry, and Alex to

11  feel her chest?

12       A.   No.

13       Q.   Did that ever happen?

14       A.   No.

15       Q.   Have you ever done mechanical work in

16  exchange for any type of sexual favor?

17       A.   Yes.

18       Q.   What sexual favor?

19       A.   Being with a women.

20       Q.   Having sex?

21       A.   Yeah.

22       Q.   Did you ever engage in -- or perform

23  repair services or mechanical services in exchange for

24  oral sex?

25       A.   No.

JOE ROTH

90

| | | |
|---|---|---|
| 1 | Q. | Did she perform any sexual favors? |
| 2 | A. | No. |
| 3 | Q. | Have you ever had sex in your shop? |
| 4 | A. | No. |
| 5 | Q. | Have you ever had sex with any employees? |
| 6 | A. | No. |
| 7 | Q. | Are you a homosexual? |
| 8 | A. | No. |

9     Q.   Did you tell Ms. Polanco that you and two
10 employees paid a woman for sexual acts, and you paid
11 for Larry to receive sex, including oral sex, because
12 Larry was slow and doesn't ever get laid?

| | | |
|---|---|---|
| 13 | A. | Yes. |
| 14 | Q. | When was that? |
| 15 | A. | Two or three years ago. |
| 16 | Q. | Who was the woman? |
| 17 | A. | I can't remember her name. |
| 18 | Q. | And she had sex with Larry? |
| 19 | A. | Yes. |
| 20 | Q. | And yourself? |
| 21 | A. | Yes. |
| 22 | Q. | And Alex? |
| 23 | A. | Yes. |
| 24 | Q. | At the same time? |
| 25 | A. | No. |

JOE ROTH

91

```
 1          Q.   Was it at the shop?

 2          A.   It was outside of the shop.

 3          Q.   Okay.  So it was on the premises but

 4    outside?

 5          A.   Yeah.

 6          Q.   And she performed oral sex on Larry as

 7    well?

 8          A.   Yeah.

 9          Q.   And you watched?

10          A.   No.

11          Q.   You waited until he was done?

12          A.   It wasn't all the same day.

13          Q.   Okay.  And how much did you pay her?

14          A.   Nothing.

15          Q.   Okay.  Well, I just asked you if you

16    said --

17          A.   Oh, yeah, like 40 bucks or something like

18    that, yes.

19          Q.   $40 each time?

20          A.   No.  Total.

21          Q.   So she had sex with three men, you, Alex,

22    and Larry, and she performed oral sex on Larry for

23    $40?

24          A.   I only paid her $40.

25          Q.   Did the other guys pay?
```

JOE ROTH

```
1        Q.    Do you think that?

2        A.    Yeah.

3        Q.    Okay.  Why do you think that?

4        A.    The way she dressed.  The way she -- her

5    demeanor was.

6        Q.    Okay.  Do you respect her?

7        A.    No.

8        Q.    Okay.  Do you think she deserves this

9    kind of behavior?

10       A.    Yes and no.

11       Q.    Okay.  Why yes?

12       A.    Well, if you walk around looking like

13   that, then that's the -- and the things that she used

14   to tell us about, you know, her boyfriend and, you

15   know, she got on probation because she did this and

16   that, and I can't remember the other things she did.

17       Q.    Do you believe that she deserves to be

18   raped?

19       A.    No.

20       Q.    Are you aware that she's been raped

21   twice?

22       A.    No.

23       Q.    If you were aware of that, would that

24   have changed your behavior at all?

25       A.    Yes.
```

JOE ROTH

```
 1          Q.   Why?

 2          A.   Because I would feel sorry for somebody

 3    that was like that.

 4          Q.   But I thought you just said that the way

 5    people dress invites -- they deserve to be raped

 6    because they dress that way?

 7          A.   Well, they do.  If she's been raped and

 8    she doesn't fix her clothing, it's her own fault.

 9          Q.   Okay.  So your testimony is that it could

10    be -- her rape could be her fault?

11          A.   Yes.

12          Q.   And you don't respect her?

13          A.   No.

14          Q.   And you believe she deserved the type of

15    conversation and comments that you made to her while

16    she was your employee?

17          A.   Yes.

18          Q.   Have you ever been physically abusive to

19    a woman?

20          A.   No.

21          Q.   Did you want to be physically abusive to

22    Tasheena?

23          A.   No.

24          Q.   Were you angry at her?

25          A.   No.
```

JOE ROTH

1        Q.    Did you ever cheat on her?

2        A.    No.

3        Q.    How many times did you ask Ms. Polanco

4    for a massage?

5        A.    Two or three.

6        Q.    You told CCRD many times.  Do you believe

7    it was two or three or was it many times?

8        A.    Two or three.

9        Q.    So what you said to the CCRD was

10   incorrect?

11       A.    Yes.

12       Q.    Okay.  Did you ever offer anything in

13   return for the massages?

14       A.    No.

15       Q.    Did she ever agree to give you a massage?

16       A.    I would say she said to give her a call,

17   but we never got massages.

18       Q.    On June 6 did she -- of 2009, did she

19   refuse to give you a massage?

20       A.    No.

21       Q.    Okay.  And she was terminated on June 8;

22   is that correct?

23       A.    Yes.

24       Q.    So your testimony is that two days prior

25   to her termination, she did not refuse to give you a

## AFFIDAVIT OF TASHEENA POLANCO

STATE OF COLORADO      )
              ) ss.
COUNTY OF DENVER     )

I, Tasheena Polanco, state as follows:

 I am over the age of eighteen and fully competent to make this Affidavit. I have personal knowledge of all facts recited in this Affidavit and, if called as a witness, I could and would competently testify as to all matters contained herein. I hereby state and affirm as follows:

 1. I am the Plaintiff in the adversary proceeding Polanco v. Roth, Adv. No. 12-1010-MER.

 2. I have reviewed the Complaint and Jury Demand in this matter and state that all allegations therein are true.

 3. I have reviewed the accompanying Response to Defendant's Motion for Summary Judgment and state that all allegations therein are true.

 4. The defendant in this action, Joseph Roth, has willfully and maliciously caused me severe emotional and mental injuries.

 5. Mr. Roth seemed like he disliked me and took every opportunity to belittle me and subject me to his disgusting behavior.

 6. I was hired by Mr. Roth to work at Roth Automotive on May 12, 2009. My job title was Shop Cleaner and U-Haul Representative.

 7. On my first day of work, Mr. Roth asked me if I had a boyfriend.

 8. During my employment, Mr. Roth made numerous comments about my breasts. For example, before I was hired, he told me that he "liked my boobs."

 9. On one occasion, while I was leaning across a desk to clean it, Mr. Roth stated, "Look what's on the desk."

 10. When a former employee of Roth Automotive came into the shop, Mr. Roth told him, "Look, Larry, your replacement has boobs."

 11. One day, while I was reaching up to clean a glass window, Mr. Roth approached the other side of the glass and licked the glass across from my breasts.

 12. Mr. Roth regularly described his own sexual conduct to me, including visiting strip clubs, paying women for sex, having sex at the auto shop, and trading car repair services for sexual favors.

13.     Mr. Roth described an occasion to me in which he and two other employees paid a woman to have sex with each of them.

14.     Mr. Roth told me about going to "whore houses" and that he knew of a place where he could choose from "new, hot Hispanic girls" for forty dollars. I am Hispanic, and Mr. Roth knew that when he made this statement.

15.     On one occasion, Mr. Roth showed me a condom and told me he was going to a strip club after work.

16.     Mr. Roth showed me a sexually explicit photograph that was found in one of the vehicles, and then he displayed the photograph in the shop.

17.     One day, I stated that I was going to the bathroom. Mr. Roth cupped his hands in front of me and stated, "Can I help?"

18.     Mr. Roth made unwelcome and inappropriate sexual conduct with me multiple times.

19.     While I was giving Mr. Roth a high five, he bumped my breast with his elbow and stated, "Ooh, let's try that one more time."

20.     Another time, while Mr. Roth and I were sitting at the computer, he reached between my legs to throw away a piece of trash. As he pulled his hand back, he intentionally brushed his hand across my crotch, and then smelled his hand and stated, "Thanks."

21.     Mr. Roth asked me numerous times during my employment to give him a massage. He called me at home several times to ask for massages. His first request occurred on my first day of work. Each time Mr. Roth asked me to give him a massage, I declined his request.

22.     On June 6, 2009, Mr. Roth asked me again for a massage. I refused to do so.

23.     On June 8, 2009, I was terminated from Roth Automotive.

24.     I have been raped twice. Each of these incidents occurred prior to my employment by Mr. Roth.

25.     Mr. Roth's actions caused me severe emotional and mental injuries. I have developed severe anxiety, and I have frequently experienced fear, anxiousness, sadness and hurt since my termination.

26.     I have also developed a fear of persons of authority, and I have particular difficulty interacting with unfamiliar males.

27.    I would have sought medical attention for my emotional pain, but my lack of income and health insurance made it impossible for me to pay for such treatment.

28.    I have visited with a counselor, Cathy Barton, on several occasions to discuss the emotional distress that was caused by my employment with Mr. Roth. I was introduced to Ms. Barton through a free program at my church. I saw Ms. Barton several times during 2010 and 2011. Ms. Barton's guidance helped me cope with the mental and emotional anguish that developed during the course of my employment with Roth Automotive.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on September 10, 2012.

Tasheena Polanco

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 11-34121-MER |
| ROTH, JOSEPH ANTHONY | ) | |
| EIN/SSN: xxx-xx-3705 | ) | Chapter 7 |
| | ) | |
| Debtor(s) | ) | |
| _____ | ) | |
| TASHEENA POLANCO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adv. Proc. No. 12-1010-MER |
| JOSEPH ANTHONY ROTH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

**PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO FED. R. BANKR. P. 7026**

---

Plaintiff Tasheena Polanco ("Plaintiff" or "Polanco"), by and through her attorneys, the

Traylor Law Group, LLC, hereby submits the following Initial Disclosures pursuant to FED. R.

BANKR. P. 7026 and FED. R. CIV. P. 26(a)(1):

   I.   **Individuals likely to have discoverable information that Plaintiff may use to support her claims:**

   1.   Tasheena Polanco. Ms. Polanco can be contacted through her attorneys, the

Traylor Law Group, LLC, 1721 High Street, Denver, Colorado 80218, 303-321-1862. Ms.

Polanco has information related to the allegations in the Complaint including, but not limited to,

Defendant's unlawful battery and harassment and the injuries she suffered as a result of

Defendant's intentional conduct.

2.      Joseph Roth, 13643 Windom Lane, Broomfield, Colorado 80023. Mr. Roth has information regarding his unlawful harassment and battery of Plaintiff.

3.      Alex Sabas. Address and telephone number unknown. Mr. Sabas may have information regarding Defendant's unlawful treatment of Plaintiff.

4.      Karen Avila, 11817 Maiden Way, Northglenn, Colorado 80233, 720-629-6047. Ms. Avila may have information regarding Defendant's unlawful treatment of Plaintiff and the injuries Plaintiff sustained as a result of Defendant's conduct.

5.      Cathy Barton, 6226 123rd Drive, Brighton, Colorado 80602, 303-280-5112. Ms. Barton may have information regarding the injuries Ms. Polanco sustained as a result of Defendant's conduct.

6.      Any witnesses identified by Defendant.

7.      Any witnesses necessary to authenticate documents or for rebuttal testimony.

8.      Any person identified in either party's discovery responses.

**II.     Description by category and location of all documents, data compilations, and tangible things that are in possession, custody, or control of the Plaintiff and may be used to support her claims, unless solely for impeachment:**

The following documents, data compilations, and tangible things are in the possession, custody, or control of the Plaintiff. These documents are available for review, inspection, and/or copying at the offices of the Traylor Law Group, LLC at a mutually agreeable date and time.

1.      An explicit photograph obtained by Ms. Polanco from Mr. Roth.

2.      Documents submitted to and/or received from the Colorado Civil Rights Commission.

3.      Transcript from the deposition of Joseph Roth on September 8, 2011.

**III.    Computations of each category of damages claimed by the Plaintiff:**

Plaintiff is claiming economic and compensatory damages, and all other relief the Court deems just and proper. Plaintiff initially estimates her damages as follows:

| | |
|---|---|
| $28,500 | Back pay |
| $30,000 | Front pay |
| $200,000 | Non-economic damages |
| $772,500 | Exemplary damages |
| $1,031,000 | TOTAL |

These damages have been calculated by Plaintiff's counsel to represent the estimated damages as of the current date and are presented only as a good-faith effort to comply with the Court's directives. These damages are ongoing and Plaintiff reserves the right to amend and update her damages.

**IV.     Insurance agreement:**

Plaintiff is unaware of any insurance agreement in this matter.

DATED this 26th day of June, 2012.

Respectfully submitted,

**TRAYLOR LAW GROUP, LLC**

*s/Whitney C. Traylor*
Whitney C. Traylor
Brice P. Kindred
Craig T. Truitt
1721 High Street
Denver, CO 80218
Phone: (303) 321-1862
Facsimile: (303) 837-1214

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO FED. R. BANKR. P. 7026** was served on this 26th day of June, 2012, via email addressed to the following:

Manuel Solano, Esq.
12000 N. Washington Street, Ste. 310
Thornton, CO 80241
solanolaw@earthlink.net

s/Whitney C. Traylor

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 11-34121-MER |
| ROTH, JOSEPH ANTHONY | ) | |
|          Chapter 7 | ) | |
| | ) | |
|     Debtor | ) | |
| _____ | ) | |
| TASHEENA POLANCO, | ) | |
| | ) | |
|    Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adv. Proc. No. 12-1010-MER |
| JOSEPH ANTHONY ROTH, | ) | |
| | ) | |
|    Defendant. | ) | |
| | ) | |

---

## DEFENDANT'S FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ.P. 33, Defendant, Joseph A. Roth, submits the following interrogatories to Plaintiff, Tasheena Polanco.

### INSTRUCTIONS

(a) An answer or other appropriate response must be given to each interrogatory.

(b) As a general rule, within 30 days after you are served with these interrogatories, you must serve your responses on Defendant.

(c) Each answer must be as complete and straightforward as the information reasonably available to you permits. If an interrogatory cannot be answered completely, answer it to the extent possible.

(d) If you do not have enough personal knowledge to fully answer an interrogatory, say so, but make a reasonable and good faith effort to get the information by asking other persons or organizations.

(e) Whenever an interrogatory may be answered by referring to a document, the document may be attached as an exhibit to the response and referred to in the response. If the document has more than one page, refer to the page and section where the answer to the interrogatory can be found.

1

(f) Whenever an address and telephone number for the same person are requested in more than one interrogatory, you are required to furnish them in answering only the first interrogatory asking for that information.

(g) Your answers to these interrogatories must be verified, dated, and signed

## DEFINITIONS

Words in BOLDFACE CAPITALS in these interrogatories are defined as follows:

(a) INCIDENT includes the circumstances and events surrounding the alleged accident, injury, or other occurrence identified in the Complaint which underly this action or proceeding.

(b) YOU OR ANYONE ACTING ON YOUR BEHALF includes you, your agents, your employees, your insurance companies, their agents, their employees, your attorneys, your accountants, your investigators, and anyone else acting on your behalf.

(c) PERSON includes a natural person, firm, association, organization, partnership, business, trust, corporation, or public entity.

(d) DOCUMENT means a writing, as defined in FRE 1001 and includes the original or a copy of handwriting, typewriting, printing, photostating, photographing, and every other means of recording upon any tangible thing and form of communicating or representation, including letters, words, pictures, sounds, or symbols, or combinations of them.

(e) HEALTH CARE PROVIDER includes any PERSON or entity referred to as a "Health Care Professional" or "Health Care Institution" in C.R.S. § 13-64-202(3) and (4).

(f) ADDRESS means the street address, including the city, state, and zip code.

## INTERROGATORIES

1. State the name, ADDRESS , telephone number, and relationship to you of each PERSON who prepared or assisted in the preparation of the responses to these interrogatories. (Do not identify anyone who simply typed or reproduced the responses.)

2. State:

   (a) your name;

2

(b) every name you have used in the past;

(c) the dates you used each name.

3.  State the date and place of your birth.

4.  State:

    (a)  your present residence ADDRESS ;

    (b)  your residence ADDRESSES for the last five years;

    (c)  the dates you lived at each ADDRESS .

5.  State:

    (a)  the name, ADDRESS , and telephone number of your present employer or place of self-employment;

    (b)  the name, ADDRESS , dates of employment, job title, and nature of work for each employer or self-employment you have had from five years before the INCIDENT until today.

6.  State:

    (a)  the name and ADDRESS of each school or other academic or vocational institution you have attended beginning with high school;

    (b)  he dates you attended;

    (c)  the highest grade level you have completed;

    (d)  the degrees received.

7.  Have you ever been convicted of a felony? If so, for each conviction state:

    (a)  the city and state where you were convicted;

    (b)  the date of conviction;

    (c)  the offense;

    (d)  the court and case number and name and ADRESS of your probation officer, if any.

8.  Do you attribute any physical, mental, or emotional injuries to the INCIDENT

9. If so, identify each injury you attribute to the INCIDENT and the area of your body affected.

10. Do you still have any complaints that you attribute to the INCIDENT ?

   If so, for each complaint state:

   (a) a description;

   (c) whether the complaint is subsiding, remaining the same, or becoming worse;

   (d) the frequency and duration.

11. Did you receive any consultation or examination or treatment from a HEALTH CARE PROVIDER for any injury you attribute to the INCIDENT ?

   If so, for each HEALTH CARE PROVIDER state:

   (a) the name, ADDRESS , and telephone number;

   (b) the type of consultation, examination, or treatment provided;

   (c) the dates you received consultation, examination, or treatment;

   (e) the charges to date.

12. Have you taken any medication, prescribed or not, as a result of injuries that you attribute to the INCIDENT ?

   If so, for each medication state:

   (b) the name;

   (c) the PERSON who prescribed or furnished it;

   (c) the date prescribed or furnished;

   (d) the dates you began and stopped taking it;

   (d) the cost to date.

13. Are there any other medical services not previously listed (for example, ambulance, nursing, prosthetics, psychiatric or psychological)?

4

If so, for each service state:

(a) the nature;

(b) the date;

(c) the cost;

(d) the name, ADDRESS , and telephone number of each provider.

14. Has any HEALTH CARE PROVIDER advised that you may require future or additional treatment for any injuries that you attribute to the INCIDENT ?

If so, for each injury state:

(a) the name and ADDRESS of each HEALTH CARE PROVIDER ;

(b) the complaints for which the treatment was advised;

c) the nature, duration, and estimated cost of the treatment.

15. Do you attribute any loss of income or earning capacity to the INCIDENT ?

If so, state:
(a) the nature of your work;

(b) your job title at the time of the INCIDENT ;

(c) the date your employment began.

16. State the last date before the INCIDENT that you worked for compensation.

17. State your monthly income at the time of the INCIDENT and how the amount was calculated.

18. State the date you returned to work at each place of employment following the INCIDENT .

19. State the dates you did not work and for which you lost income.

20. State the total income you have lost to date as a result of the INCIDENT and how the amount was calculated.

21. Will you lose income in the future as a result of the INCIDENT ?

If so, state:

(a) the facts upon which you base this contention;

(b) an estimate of the amount;

(c) an estimate of how long you will be unable to work;

(d) (how the claim for future income is calculated.

22. Are there any other damages that you attribute to the INCIDENT ?

If so, for each item of damage state:

(a) the nature;

(b) the date it occurred;

(c) the amount.

23. List all physical, mental, and emotional disabilities you had immediately before the INCIDENT . (You may omit mental or emotional disabilities unless you attribute any mental or emotional injury to the INCIDENT .)

24. At any time after the INCIDENT , did you sustain injuries of the kind for which you are now claiming damages.

If so, for each incident state:

(a) the date and the place it occurred;

(b) the name, ADDRESS , and telephone number of any other PERSON involved;

(c) the nature of any injuries you sustained;

(d) the name, ADDRESS , and telephone number of each HEALTH CARE PROVIDER that you consulted or who examined or treated you;

(e)the nature of the treatment and its duration

25. Except for this action, in the last ten years have you filed an action or made a written claim or demand for compensation for personal injuries?

If so, for each action, claim, or demand state:

(a)the date, time, and place and location of the INCIDENT (closest street ADDRESS or intersection);

6

(b) the name, ADDRESS , and telephone number of each PERSON against whom the claim was made or action filed;

(b) the court, names of the parties, and case number of any action filed;

(e) the name, ADDRESS , and telephone number of any attorney representing you;

(f)  whether the claim or action has been resolved or is pending.

Respectfully,

*s/ Manuel J. Solano*
Manuel J. Solano, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **DEFENDANT'S FIRST SET OF INTERROGATORIES** was served on this 5TH day of July. 2012, via email addressed to the following:

Whitney C. Traylor, Esq.
1721 High Street
Denver, CO 80218
wtraylor@traylorlawgroup.com

*s/Karen Marquez*
Karen Marquez